**Clark Boyd HAMILTON and Roy Eugene Kimes, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 19343.

United States Court of Appeals Fifth Circuit.
June 20, 1962.

Ivan Alexander, Jr., Warren Berzett, Dallas, Tex., for appellants.

Robert B. Ward, Asst. U. S. Atty., Dallas, Tex., Barefoot Sanders, U. S. Atty., for appellee.

Before HUTCHESON, RIVES and BELL, Circuit Judges.

RIVES, Circuit Judge: The indictment charged that:

"During the period of time commencing on or about the 21st day of October, 1960, continuing to on or about the 1st day of June, 1961, defendants ORVILLE WILBURN REYNOLDS, CLARK BOYD HAMILTON, KENNETH LEON LOOPER and ROY EUGENE KIMES, conspired among themselves to violate Section 2312, Title 18, United States Code, by transporting and causing to be transported in interstate commerce from Dallas County, Texas, to the State of California stolen motor vehicles, knowing the motor vehicles to have been stolen, and in order to effect the object of the conspiracy, the defendants committed the following overt acts:" (12 overt acts were described.)

After a four-day trial, the jury returned its verdict finding each defendant guilty as charged. Defendants Reynolds and Looper received probated sentences and did not appeal. Defendants Kimes and Hamilton were each sentenced to imprisonment for a term of five years, and prosecute their appeals. The most substantial questions concern the sufficiency of the evidence to support the judgments of conviction of Kimes and Hamilton.

We have carefully read and studied the entire transcript of testimony comprising 460 typed pages. It concerns sixteen automobiles, eight of which were stolen. Of the other eight automobiles, seven were not stolen but were late model wrecks sold to Reynolds by salvage dealers, and the last was Reynolds' personal automobile. In each instance the serial number plate on the front door post of a wrecked automobile (and of Reynolds' personal car) was removed and placed on a stolen automobile of the same description. The eight stolen automobiles were ultimately identified by means of the confidential numbers which they bore.

The defendant Reynolds had been Sheriff of Bryan County, Oklahoma, in 1955 and 1956, but had been defeated for re-election. Of the four defendants, his guilt was the most obvious. He had openly purchased the seven wrecked automobiles, and had handled the sales of the eight stolen automobiles to used car dealers in California.

Reynolds did not at the outset make clear that he was pleading guilty, but sat with the other three defendants until his guilt had been conclusively proved. He was then called as the Government's closing witness. On cross-examination, he admitted that he had been in conference with a probation officer, FBI Agents, and the United States Attorney before and during the trial, and had volunteered to plead guilty and to testify. Reynolds' testimony, however, did not directly connect Kimes or Hamilton with a criminal conspiracy, or with knowledge that any of the automobiles was stolen. Reynolds admitted that he had purchased the stolen automobiles at prices ranging from $200.00 to $300.00 each, but said that he would rather not testify from whom any of the purchases were made. There was no insistence that he answer that inquiry. On direct examination his final question and answer were:

"Q. At the time you made the buys from someone you don't care to reveal, I will ask you whether or not at least one or more of the men sitting back here on this bench were present at the time that buy was made?

"A. I had rather not answer that question."

Reynolds testified that he met Kimes in 1955. Reynolds was then Sheriff of Bryan County, and Kimes also resided in Oklahoma. (R. 403). Reynolds tes-

tified that he first met Hamilton and Looper in April 1961 at "a drive-in" on West Commerce Street in Dallas, and that they were with Kimes at that time. (R. 404.) In April or May of 1961, one Johnny Welburn had made a trip to California for Reynolds with a "hook-up," that is one automobile towing another. As to that trip, Reynolds testified:

"A. Well, I had planned on another fellow taking this particular hook-up and I met Mr. Kimes in Durant and he asked me had I acquired anybody to make the trip for me and I told him I had not, and he said Welburn wanted to go.

"Q. Did he get Welburn and bring him there to you?

"A. Yes, sir, he did.

"Q. Prior to the time Welburn came there, I will ask you if the defendant Kimes had an occasion to see either of the automobiles which Welburn took to California?

"A. I wouldn't know whether he had occasion to see them or not."

Reynolds' only other reference to Kimes was:

"Q. I will ask you if Kimes has ever contacted you about salvage being available?

"A. I believe one time."

Reynolds made some kind of arrangement with Hamilton and with Looper for them to haul wrecked automobiles which Reynolds bought and store them in their back yards. Reynolds did not testify what that arrangement was. Looper testified that for his services Reynolds was to give him a new motor for his truck (Looper was a truck driver), and 30 per cent of the proceeds of any parts he could sell from the wrecked automobiles. Neither Kimes nor Hamilton testified. There was no testimony to connect Looper, Hamilton or Kimes with the removal of the serial number plate from any of the wrecked automobiles.

Hamilton introduced Reynolds to Charlie Brown who operated an automobile salvage yard in Dallas (R. 407). Rey-

nolds testified that he purchased one of the stolen automobiles at a Texaco filling station on South Beckley Street in Dallas "probably in May, April or May" (R. 411). Reynolds had a driver with him to take that car, "I believe that was Mr. Fred Herring." (R. 412.) Reynolds did not testify from whom he purchased the stolen automobile. The nearest that he came to connecting Hamilton or Looper with it was to testify that they were at the service station at the time he made the purchase. Looper testified that he bought gas for his truck at this service station. There is no more than suspicion that Hamilton's presence at the service station had any connection with the stolen automobile.

Reynolds testified that on one occasion a "hook-up" of two of the stolen automobiles was made in front of Hamilton's house (R. 415, 416.) He did not connect Hamilton with the "hook-up" or with knowledge that either of the cars was stolen, other than to testify that he had hired a man named Lyday to drive this "hook-up" to California and that,

"A. Mr. Hamilton was going to drive Mr. Lyday over to Fort Worth and he was to take the cars from Fort Worth.

"Q. Why was Mr. Hamilton to take Mr. Lyday to Forth Worth?

"A. Well, it seemed that the truck was locked and I believe Mr. Hamilton was going to go over there to see a keymaker and get a key made and drive the car over for Lyday because Lyday was not familiar with the city.

"Q. When they left, I will ask you if any person left with them, were they followed by anyone else?

"A. Yes sir, Mr. Looper, I believe, went over to bring Mr. Hamilton back."

Lyday and Looper corroborated this connection of Hamilton with the "hook-up," but both denied any knowledge that the cars were stolen, and neither testified to any facts or circumstances from which such knowledge on the part of Hamilton

could be inferred. Asked, " * * * did Hamilton ever contact you about salvage that you might be able to purchase in Dallas?", Reynolds replied, "I believe he has."

The test by which we review the sufficiency of the evidence of guilt of Kimes and of Hamilton has been well stated for this Court by Judge Jones in Clark v. United States, 5 Cir. 1961, 293 F.2d 445, 448:

> "This court, although recognizing that questions as to credibility of witnesses and weight of evidence are for the jury, has the right and, we may say, is under a duty, to examine the record and determine whether there was any competent and substantial evidence fairly tending to support the verdict of guilt. In so reviewing the sufficiency of the evidence to justify a finding of guilt beyond a reasonable doubt in a circumstantial evidence case, the test we are to apply is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt. Riggs v. United States, 5 Cir., 1960, 280 F.2d 949; Cuthbert v. United States, 5 Cir., 1960, 278 F.2d 220; Dicks v. United States, 5 Cir., 1958, 253 F.2d 713."

See also, Getchell v. United States, 5 Cir. 1960, 282 F.2d 681, 689; Bourg v. United States, 5 Cir. 1960, 286 F.2d 124, 126; Curtis v. United States, 5 Cir. 1961, 297 F.2d 639, 640; Greenhill v. United States, 5 Cir. 1962, 298 F.2d 405, 410.

The foregoing is a substantial re-statement of all of the evidence from which the jury could find or infer that either Hamilton or Kimes knew, or were charged with knowledge or notice, that any of the automobiles was stolen. Clearly, the evidence does not exclude every reasonable hypothesis other than that of guilt of Kimes or of Hamilton. The jury could not properly find or infer beyond a reasonable doubt that either of these defendants was guilty. The case will be remanded so that a new trial may be had, if the Government can produce other evidence which in the opinion of the district court will warrant a new trial. See Clark v. United States, supra, 293 F.2d at 448.

Reversed and remanded.