[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-10489

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

RICHARD H. SMITH,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:19-cr-00122-RAH-JTA-1

————————————————

Before JORDAN, BRANCH, and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, Richard Smith appeals the district court's denial of his motion to suppress evidence (cocaine and a gun) seized from his person during a traffic stop conducted as part of a larger investigation into a drug trafficking organization.

After careful review and based on the totality of the circumstances, we conclude that the officer had sufficient evidence supporting a reasonable suspicion that Smith was transporting drugs to a dealer in the area, warranting the extension of the traffic stop and detention of Smith. We thus affirm the district court's denial of Smith's motion to suppress.

## I.    FACTS

A federal grand jury charged Smith and two codefendants, Mellissa Stacy Ann Smith and Ronnie White, in a superseding indictment.[1]  Smith was charged with (1) conspiracy to distribute and possess a controlled substance with intent to distribute, in violation of 21 U.S.C. § 846 (Count 1); (2) possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count 2); (3) possession of a firearm during and in relation to a drug trafficking crime, in violation of 21 U.S.C. § 924(c)(1)(A)(i) (Count 3); (4) conspiracy to launder money, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (h) (Count 4); and

---

[1] Neither of Smith's codefendants is a party to this appeal.

(5) use of a communication facility to further the conspiracy, in violation of 21 U.S.C. § 843(b) (Count 9).

On May 15, 2020, Smith moved to suppress the cocaine and gun found on Smith's person during a traffic stop.

On June 17, 2020, a magistrate judge held a hearing on the motion to suppress. We recount the facts from (1) the testimony and wiretap evidence presented at the motion-to-suppress hearing and (2) the dashboard camera video from the traffic stop.

## A. Evidence from the Suppression Hearing and Dashboard Camera

This was not a routine traffic stop. Rather, it was a coordinated drug interdiction operation.

In 2016, the Drug Enforcement Administration ("DEA") began investigating Ronnie White for his involvement in a drug trafficking organization in Montgomery, Alabama. As part of that investigation, the DEA task force obtained three 30-day orders authorizing the interception of wire and electronic communications on White's telephone. After monitoring calls and conducting surveillance for weeks, agents suspected Defendant Smith was supplying cocaine to White regularly.

On December 16, 2017, agents listened to two intercepted calls between Smith and White. In the first call, White told Smith, "I'm looking ugly boy . . . I need ya. . . . I said I need it!" Smith replied, "I know, I know, I know. See you soon this afternoon when I get back in." In the second call, Smith told White, "I'll hook

you up in the morning alright?"   After hearing that call, agents believed Smith planned to deliver narcotics to White at White's home in Montgomery the next day.

On December 17, 2017, agents heard two more intercepted calls between Smith and White.  In the first call, White informed Smith that he was "at the crib" and Smith responded that he had "like two stops to make then" he would "come holla at [White]." In the second call, Smith asked White, "You got the credit?" and White responded, "Yea."  Smith replied, "I'm on my way."

In anticipation of the meeting between Smith and White, agents conducted surveillance at the homes of Smith and White, as well as locations in between, to locate Smith's vehicle.  Agents agreed that if Smith's vehicle was located, Lieutenant Scott Dunn of the Montgomery Police Department would conduct a traffic stop of Smith.

Lieutenant Dunn had participated in the DEA investigation by monitoring intercepted calls.  Indeed, Lieutenant Dunn was in the DEA's "wire room" when the first December 17th call was intercepted.  Lieutenant Dunn left the wire room and parked on a road in east Montgomery to await Smith's vehicle.  Although the planned traffic stop was part of the DEA's drug trafficking investigation, Lieutenant Dunn testified that he was instructed to establish independent probable cause for a traffic stop of Smith.[2]

---

[2] Lieutenant Dunn explained that the DEA task force asked him to get independent probable cause to stop Smith's vehicle in case they had to charge

22-10489                 Opinion of the Court                 5

At approximately 2:42 p.m., Lieutenant Dunn spotted Smith traveling toward White's residence. Consistent with his instructions, Lieutenant Dunn stopped Smith's car for both suspected drug trafficking and a window tint violation.

According to Lieutenant Dunn, Smith was overly friendly but appeared extremely nervous. Lieutenant Dunn noted that, based on his training and experience, people who displayed extreme friendliness during traffic stops often had drugs on them. Lieutenant Dunn also observed that Smith was shaking and breathing very fast, his neck veins were extended, his heart was beating in his throat, and Smith got more nervous as time passed.

Lieutenant Dunn told Smith that he was going to write him a warning for the tint violation and asked him to come to Lieutenant Dunn's car. When Smith exited his car, Lieutenant Dunn asked if he had any weapons. Smith replied that he had a gun on his person and had a license for it. Lieutenant Dunn took the gun and conducted a quick pat-down for weapons. During that pat-down, Lieutenant Dunn found a cell phone. Lieutenant Dunn placed the cell phone and gun in Smith's car. Lieutenant Dunn then asked Smith to sit in the police car while Lieutenant Dunn typed up the warning.

As he prepared the window tint warning, Lieutenant Dunn made general conversation with Smith. Lieutenant Dunn testified

---

Smith in state court because the wire case targeting White was sealed at the time.

that during traffic stops he would engage people in conversation "to try to alleviate some of [their] nervousness" so "[t]hat way [he] can rule out people that are involved in criminal activity versus people who are just committing traffic violations." Lieutenant Dunn observed that Smith did not become less nervous from the general conversation or after being told he was only receiving a warning. Lieutenant Dunn also noticed the smell of chemicals that typically emit from cocaine.

Lieutenant Dunn then asked Smith where he lived, and Smith provided his address in Wetumpka. Lieutenant Dunn then asked what Smith was doing in the Montgomery area. Smith said he was on his way home from a local movie theater, although he had not seen a movie. That statement struck Lieutenant Dunn as odd because he did not "know too many people that go to the theater and not watch a movie." Lieutenant Dunn also observed that Smith was traveling in the direction of White's house.

After Lieutenant Dunn issued the warning, he held Smith for additional questioning. At the hearing, Lieutenant Dunn explained that Smith was not free to leave at that time because of (1) the intercepted calls indicating that Smith would be delivering drugs to White, (2) Smith's driving toward White's home, (3) Smith's behavior during the stop (e.g., overly friendly, nervous, breathing rapidly, visibly shaking, noticeable neck veins, dubious answers to simple questions), and (4) the smell of cocaine.

Lieutenant Dunn asked Smith if his car contained any dead bodies, marijuana, or heroin. Smith said no. Then Lieutenant

Dunn asked if he had any cocaine. In response, Smith laughed nervously, said no, licked his lips, and swallowed "real hard." Lieutenant Dunn believe that Smith became more nervous when asked about cocaine based on his change in demeanor.

Lieutenant Dunn asked if he could search Smith's car. Smith asked if he needed to call an attorney. Lieutenant Dunn responded that he was going to have a dog smell around the car, and if the dog did not smell anything, Smith would be free to go, but if the dog smelled something, Lieutenant Dunn would search the car.

Lieutenant Dunn called a K-9 unit. Because it was a Sunday, the K-9 unit (Corporal Payton D. Williams and his drug-trained canine, Sadie) arrived 37 minutes later. Sadie alerted for the presence of narcotics near the driver's door.[3]

Lieutenant Dunn searched Smith's car for about an hour but did not find any drugs. Based on the intercepted phone conversations with White, Lieutenant Dunn suspected that the car had a hidden compartment for storing drugs. Because it was raining and the car was on the road near White's house, Lieutenant

---

[3] Corporal Williams testified that Sadie "gave a positive indication on the vehicle." Corporal Williams explained that Sadie is trained to be "passive," so when she sits, that means she has smelled narcotics. He also explained that Sadie would alert if (1) "narcotics have been in th[e] vehicle or [(2)] someone has touched narcotics and [then] touched that [door] handle with residual odor."

Dunn decided to move the car to a safer location to search it "better."

In preparation for transporting Smith and his vehicle, Lieutenant Dunn conducted a second, more thorough pat-down search of Smith for safety. Lieutenant Dunn asked Smith if he had anything on his person and instructed Smith to put his hands up and spread his legs. According to Lieutenant Dunn, he gave these instructions because Smith seemed to be protecting his coat from Lieutenant Dunn's hands. Noticing that Smith's evasive movements caused the scent of cocaine to leave his body, Lieutenant Dunn suspected the cocaine was on Smith's body.[4] Lieutenant Dunn found the cocaine inside the left breast pocket of Smith's coat, and Smith was arrested.

## B.    Magistrate Judge's Report and Recommendation

Following the suppression hearing, the magistrate judge issued a report and recommendation ("R&R"), recommending that Smith's motion to suppress be denied.

The magistrate judge concluded that the traffic stop was not unlawfully prolonged because Lieutenant Dunn had reasonable suspicion to investigate drug trafficking based on the totality of the

---

[4] Lieutenant Dunn testified that the "various chemicals that are used to process cocaine emit[] a very distinct odor." In addition, Officer Thompson testified that he was familiar with the odor of cocaine and that the chemicals used to process cocaine cause the cocaine to emit "a very distinct and pungent chemical smell that is very, very noticeable."

circumstances, including the investigation, the wiretaps, Smith's nervous attitude and behavior, the odor of chemicals used to prepare cocaine, and the canine alert. The magistrate judge specifically "credit[ed] Lieutenant Dunn's testimony that he 'periodically' smelled the odor of chemicals relating to cocaine."

The magistrate judge also concluded that the second search of Smith's person was lawful. Specifically, the magistrate judge found that (1) the second search was reasonable because the first search was a cursory pat down of Smith's lower body and a more thorough second pat down was needed to ensure safety; and (2) Lieutenant Dunn had probable cause to believe that searching Smith would yield evidence of a crime because of the cocaine odor, the K-9 alert on the car, fruitless search of the car, intercepted communications, travel of Smith near White's residence, and questionable responses from Smith regarding his travel plans.[5]

Smith objected to the R&R.

## C.    District Court's Order

On February 24, 2021, the district court overruled Smith's objections, adopted the magistrate judge's R&R, and denied Smith's motion to suppress. The district court found, *inter alia*, that (1) the traffic stop was not unlawfully prolonged, (2) the record supported the magistrate judge's finding that the totality of the

---

[5] At one point, the R&R mistakenly refers to the defendant as Richard *White*, using his co-defendant's last name, but we know from context that the magistrate judge meant defendant Richard *Smith*.

circumstances justified the extension of the stop, and (3) the record supported the magistrate judge's acceptance of Lieutenant Dunn's testimony about Smith's behavior and the smell of cocaine.

### D.    Jury Trial and Sentence

Following the court's ruling, Smith proceeded to trial. A jury found Smith guilty on Counts 1, 2, 3, and 9 and not guilty on Count 4. The district court sentenced Smith to 145 months' imprisonment followed by 3 years of supervised release.

Smith appeals the district court's denial of his pretrial motion to suppress.[6]

## II.    STANDARD OF REVIEW

A district court's ruling on a motion to suppress presents mixed questions of law and fact. *United States v. Ransfer*, 749 F.3d 914, 921 (11th Cir. 2014). We review the district court's factual determinations for clear error and the application of the law to those facts de novo. *Id.*

## III.    DISCUSSION

As an initial matter, while Smith challenged the lawfulness of the second pat-down of his person in the lower court, he abandoned any challenge to the district court's ruling on that issue by failing to adequately brief it on appeal.[7] Additionally, Smith

---

[6] On appeal, Smith raises no issues as to his trial or sentence.

[7] Smith does not provide any law or analysis on the issue of whether the second pat-down was proper and only refers to it in passing in his argument

now concedes that the initial traffic stop was valid. Thus, we need only address the district court's determination that the traffic stop was not unlawfully prolonged.

Once an officer makes a traffic stop, he does not have unfettered authority to detain a person indefinitely, and instead, the detention is "limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1326 (1983).

To prolong a stop, an officer "must have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007) (quotation marks omitted). An officer unlawfully prolongs a traffic stop when he, "without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes." *United States v. Campbell*, 26 F.4th 860, 884 (11th Cir.) (en banc), *cert. denied*, 143 S. Ct. 95 (2022). When "each answer to the [officer's] investigative questions fail[s] to allay his concerns, the [officer's] reasonable suspicion [is] bolstered, thus justifying" the continued detention of the defendant. *United States v. Hernandez*, 418 F.3d 1206, 1211 (11th Cir. 2005).

---

section. *See United States v. Corbett*, 921 F.3d 1032, 1043 (11th Cir. 2019) (explaining that an appellant abandons a claim on appeal when he "raises it in a perfunctory manner without supporting arguments and authority" and when he "makes only passing references to it that are background to other arguments or are buried within other arguments, or both" (quotation marks omitted)). Therefore, Smith has abandoned the issue.

In determining whether reasonable suspicion exists, courts must review the "totality of the circumstances of each case to [decide] whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 747 (2002) (quotation marks omitted).

Here, the district court did not err in determining the traffic stop was not unlawfully prolonged.

First, Smith argues that he was "detained for over two hours for a suspected window tint violation." That is factually incorrect. According to the evidence presented at the suppression hearing, Lieutenant Dunn's purpose in conducting the traffic stop was twofold: He sought to investigate (1) a possible window tint violation and (2) whether Smith was delivering narcotics to White. It was this latter purpose that extended Smith's detention after Lieutenant Dunn had issued Smith a warning for the window tint violation.

We conclude Lieutenant Dunn had ample reasonable suspicion to extend Smith's detention to investigate whether Smith was engaged in drug trafficking based on the totality of the circumstances: (1) the intercepted calls indicating Smith would be delivering drugs to White that day, (2) Smith's behavior during the stop (e.g., overly friendly, nervous, breathing rapidly, visibly shaking, noticeable neck veins, dubious answers to simple questions), (3) Smith's traveling toward White's home, (4) the smell of cocaine, and (5) the canine drug alert.

Smith argues that the stop became unlawful once Lieutenant Dunn's first pat-down and subsequent search of Smith's car turned up no drugs.  Smith contends that at that point the smell of cocaine was insufficient to support reasonable suspicion because (1) cocaine has no odor and (2) the chemical odor Lieutenant Dunn claimed to have smelled is not distinctive of an illegal substance. But, as noted above, Lieutenant Dunn's reasonable suspicion was not based on the smell of cocaine *alone*.  In addition to the smell of cocaine, Lieutenant Dunn's other information and observations— the intercepted calls indicating Smith would be delivering drugs to White, Smith's traveling toward White's home, Smith's nervous behavior during the traffic stop, and the canine drug alert—all gave rise to ample reasonable suspicion that cocaine was hidden in Smith's car.  Therefore, Smith's continued detention so that Lieutenant Dunn could move Smith's car and safely conduct a better search was justified.

Smith contends officers cannot rely on the smell of cocaine to support reasonable suspicion because it does not have a distinctive odor.  However, we have regularly considered an officer's testimony about the smell of cocaine in a variety of contexts. *See United States v. Coronel*, 750 F.2d 1482, 1488 (11th Cir. 1985) (the smell of cocaine "was discernible"); *United States v. Rackley*, 742 F.2d 1266, 1268 (11th Cir. 1984) (special agent "noticed a strong acidic smell which he recognized to be the smell of cocaine").  Here, Lieutenant Dunn and Officer Thompson both testified that the chemicals used to process cocaine emit a very

14                    Opinion of the Court                    22-10489

distinct odor.[8]  More importantly, the smell of cocaine was only one of many observations that gave rise to reasonable suspicion.

## IV.    CONCLUSION

For these reasons, we affirm the district court's denial of Smith's motion to suppress.

**AFFIRMED.**

---

[8] To the extent that Smith challenges the credibility determination as to Lieutenant Dunn's testimony that he could smell cocaine, Smith has not shown that the officer's testimony, which was corroborated by another officer who smelled cocaine on Smith's clothing, was incredible as a matter of law. *See United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) ("Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses. . . . In other words, we must accept the evidence unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable fact finder could accept it." (cleaned up)).